**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**ROSE WALLACE,**

      **Plaintiff,**

   **v.**                                                    **Civil Action No. 3:21cv111**

**LOVE'S TRAVEL STOPS &**
**COUNTRY STORES**

      **Defendant.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on two motions:  Defendant Love's Travel Stops & Country Stores's ("Love's") Motion for Summary Judgment ("Love's Motion"), (ECF No. 58), and Plaintiff Rose Wallace's Partial Motion for Summary Judgment ("Wallace's Partial Motion") (collectively, the "Cross Motions"), (ECF No. 61).  Wallace brings this action against Love's under theories of negligence and negligence *per se* for failing to repair or warn about a hole in a drain into which she tripped and fell.  Love's moved for summary judgment, arguing that Wallace was contributorily negligent as a matter of law, had failed to establish the necessarily elements of negligence *per se*, and had failed to establish the necessary elements of Virginia common law negligence.  Wallace cross-moved for partial summary judgment, arguing that she prevails on all the issues of law in her negligence *per se* claim.

These matters are ripe for adjudication.  The Court heard oral argument on the Cross Motions.  (ECF No. 118.)  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).[1] For the reasons that follow, the Court will deny Love's Motion and grant Wallace's Partial Motion.

## I. Factual and Procedural Background

### A. Factual Background[2]

#### 1. The Incident

This case concerns a fall and resulting injury that occurred at a Love's truck stop in Ruther Glen, Virginia.  On March 29, 2019, Rose Wallace, a truck driver and Florida resident, "left [a] Pilot truck stop . . . and drove her truck over to the Love's [location] across the street." (ECF No. 76-6 ¶ 4; ECF No. 92-3, at 3.)  As she pulled into the Love's parking lot, she "did not observe any open parking spots," so she drove "to the diesel fuel lanes and pulled up to lane 18 at a very slight angle." (ECF No. 76-6 ¶¶ 5–6.)  Because a Love's fuel truck was already occupying lane 18 (and, according to Wallace, "was pulled up farther than a truck normally would to fuel up"), Wallace parked behind that fuel truck so that she could purchase coffee from the Love's convenience store.  (ECF No. 76-6 ¶ 7–8.)  Wallace testified that she "parked far enough behind the truck because [she] . . . thought it was possible [that the] truck could back up due to [its] position in the fuel lane." (ECF No. 76-6 ¶¶ 8–9.)  As she clarified at her deposition,

---

[1] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States." 28 U.S.C. § 1332(a)(1).  Wallace is a resident of Florida, (ECF No. 92-3, at 3), and Love's is an Oklahoma corporation with its principal place of business in Oklahoma, (ECF No. 14 ¶ 2; ECF No. 17 ¶ 2).  Wallace seeks damages in excess of $75,000. (ECF No. 14 ¶ 3.)

[2] In ruling on the Cross Motions, the Court will view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Liberty Lobby*, 477 U.S. at 255

she did not "know whether [the driver] was going forward, whether he was going to come backwards, or what he was doing." (ECF No. 62-5, at 4.)[3]

After she parked behind the vehicle in lane 18—so that her truck was roughly five to six feet behind a trench drain[4]—she exited her vehicle with two thermoses in her right hand. (ECF No. 59-3.) She "looked around for other trucks that could be approaching," and "proceeded to walk to the front of [her] truck, keeping [her] view on the side mirror of the Love's fuel truck so [she] could see the driver." (ECF No. 76-6 ¶¶ 12–13.) While she walked toward the convenience store, she "look[ed] around, checking for trucks" and "ke[pt] her eyes on" the truck in lane 18 because the fuel lane is "a bad place not to pay attention." (ECF No. 62-5, at 4; ECF No. 76-6 ¶ 15.) While walking to the convenience store, Wallace crossed over a grate covering the trench drain that ran behind the diesel fuel pumps. (ECF No. 62-3, at 3.)

"The next thing [she] kn[e]w," she had stepped into a hole left by a missing piece of the grate. (ECF No. 76-6 ¶ 16.) Her right leg had fallen into the hole so that "the front of [her right] leg struck the front of the trench drain." (ECF No. 76-6 ¶ 17.) Her "left knee and [her] head went forward fast." (ECF No. 62-5, at 4.) She "fell forward" and "caught [her]self with [her] left[]hand [and] left knee." (ECF No. 59-7, at 8.) "[Her] right leg was cut," the concrete "took the skin off [her] knuckles," and her "thermoses went flying." (ECF No. 59-7, at 8.) She

---

[3] The distance between her vehicle and the truck in lane 18 would also allow her to "back up her truck and pull through another fuel lane" if the driver remained in that lane "longer than it took [her] to get coffee." (ECF No. 76-6 ¶ 8.)

[4] At her September 7, 2021 deposition, Kelli George estimated that Wallace had parked her truck five feet from the trench drain, (ECF No. 62-7, at 4), but later clarified that, after measuring the distance, the front of Wallace's truck was six feet from the drain, (ECF No. 87-1, at 1).

suffered a "gash" in her right leg as a result. (ECF No. 92-3, at 4.)  Wallace did not see the grate before falling into it. (ECF No. 59-3, at 9.)

Wallace "got out of the hole . . . and went back to the left and looked at the sideview mirror of the Love's fuel truck to view the driver," but the driver in lane 18 "did not see her." (ECF No. 76-6 ¶ 18–19.)  Wallace then spotted what she perceived to be an unused orange safety cone "next to the bumper of the diesel island" and "placed the . . . cone near the hole in the trench drain so no one else would step in it."  (ECF No. 76-6 ¶ 22; ECF No. 92-3, at 5.)  She did so because, according to her, the hole in the grate "was not obvious or clearly visible." (ECF No. 76-6 ¶ 23.)

After Wallace moved the cone near the hole in the grate, she continued into the convenience store.  As she filled her thermoses with coffee, she noticed blood on her hand and wrapped her hand in a napkin. (ECF No. 59-3, at 9.)  She approached the cashier to pay for her coffee and asked if a manager was present. (ECF No. 59-3, at 9.)  Wallace told the Operations Manager currently on premises—Kelli George—that she needed to "put a cone out there or mark th[e] grate out there" and told her that there was "a grate missing." (ECF No. 59-3, at 9; *see* ECF No. 87-1 ¶ 2.)  George accompanied Wallace outside and took the following photographs of the grate. (ECF No. 59-3, at 9; *see* ECF No. 87-1 ¶ 2.)

4






(ECF No. 59-1, at 1–3; ECF No. 87-1 ¶¶ 2–3.)

Wallace also submitted the following photograph of the seemingly repaired grate into the record, although Kelli George avers that this photograph "was taken over two and a half years after the accident, so some aspects of the photograph are not the same," (ECF No. 87-1 ¶ 8):



(ECF No. 77-6.)

The opening in the drain was approximately eight inches wide and twelve inches long, (ECF No. 59-8, at 6), while the trench itself was twelve to eighteen inches deep, (ECF No. 62-3, at 3; *see* ECF No. 59-2, at 2; ECF No. 76-8, at 3). Despite having stopped "at this specific truck stop for many years before March 29," Wallace "had never observed [this] gap in the trench drain." (ECF No. 76-6 ¶ 24–25.)

After Kelli George took the photographs, Wallace "got in [her] truck and left." (ECF No. 59-3, at 9.)

## 2. Doug Perkins's Testimony

Earlier that morning, at around 7:00 a.m., Love's Lead Maintenance Technician Doug Perkins arrived at the Ruther Glen Love's location to begin his upkeep duties. (ECF No. 59-5,

6

at 3.)  After he "pulled the trash," he began to "block off [pumps 17 through 25] to start pressure washing" those pumps.  (ECF No. 59-5, at 3.)  He had only blocked off pumps 17 through 20 before Wallace's incident occurred.  (ECF No. 59-5, at 3.)

After Perkins had blocked off lanes 17 through 20 with one cone for each lane, (ECF No. 59-5, at 6), Kelli George notified him that Wallace had fallen into the hole.  (ECF No. 62-3, at 5.)  Perkins observed the hole and noted to himself that he should "do something about it before [they had] a ticket put in."  (ECF No. 62-3, at 5.)  So, Perkins set an "old parking sign" down over the hole.  (ECF No. 62-3, at 5.)  The hole remained in that state until a contractor arrived to fix it.  (ECF No. 62-3, at 5.)

Perkins noted that he walked by the grate a "dozen times" the morning of the incident, but never saw the gap in the grating.  (ECF No. 87-2, at 10.)  Indeed, he stated that "[i]f [he] had seen it, it would have been taken care of."  (ECF No. 59-5, at 7.)  He explained that lane 18 was "not always empty," that sometimes trucks were in the lane, that sometimes he places the cones behind the trucks, and that the "grate is not always visible."  (ECF No. 87-2, at 10.)  For example, if a "truck is sitting in the lane, [it is] covering the grate up completely."  (ECF No. 87-2, at 10.)

Although the trench drain was not technically an approved walkway, Perkins acknowledged that "every driver who comes in and inspects their vehicle while they[ are] fueling up would walk over the trench drain area."  (ECF No. 62-3, at 11.)  In other words, according to him, although crossing over the drain is "not the normal flow of traffic," "people do, in fact, walk in that area."  (ECF No. 62-3, at 11.)  In Perkins's experience, trucks would at times park behind other trucks as well.  (ECF No. 87-2, at 8.)  Typically, these drivers would then either walk between the trucks or would walk behind their trailer in order to access the convenience

store—otherwise, the driver would have to step over or under the fuel hose as the other driver was refueling. (ECF No. 87-2, at 8.) Wallace's expert witness Ronald Santicola likewise noted that based on the location and design of the fuel island, "people are going to be out and about taking care of their trucks, walking around[,]" and that the area would see "general foot traffic." (ECF No. 59-8, at 5.) Indeed, Love's corporate designee William Stanton[5] stated that it was "common" for drivers to park behind other trucks in the diesel fuel lanes. (ECF No. 76-12, at 3.)

### 3.    Love's Maintenance Procedures

According to Love's operation manuals, an onsite Love's manager must complete a "paper store walk" whereby they inspect the premises at the beginning of each shift.[6] (ECF No. 59-4, at 3.) An inspection is to occur every eight hours. (ECF No. 92-4, at 4.) According to

---

[5] Love's designated Stanton as its corporate witness pursuant to Federal Rule of Civil Procedure 30(b)(6). (ECF No. 76-12, at 1.) This Rule states:

*Notice or Subpoena Directed to an Organization.* In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination. A subpoena must advise a nonparty organization of its duty to confer with the serving party and to designate each person who will testify. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

Fed. R. Civ. P. 30(b)(6).

[6] The inspection is "[s]upposed to be" completed at the start of each shift. (ECF No. 59-4, at 3.) Although George could not attest to the frequency with which other managers completed the inspection, she testified that when she was responsible for the inspection—including on the day of the incident—she completed the inspection daily. (ECF No. 59-4, at 3.) The record does not evince whether an inspection had been completed the morning of March 29.

Love's Operations Manager Kelli George, the manager must inspect the diesel fuel bays but need not "specifically" examine the trench train near the bays. (ECF No. 59-4, at 3.)

As a maintenance technician, Doug Perkins is responsible for regularly cleaning the fuel lanes and trench drains.[7] When he cleans a lane through pressure washing, he "start[s] at the back of the lane with [his] back facing all trucks" (ECF No. 59-5, at 5.) He then "walk[s] backwards toward the grate, keeping [his] eyes forward the whole time so [he] can see what [he has] to pressure wash." (ECF No. 59-5, at 7.) While doing so, he is "generally looking all around" and "just making sure" he knows what is going on "in [his] whole area." (ECF No. 59-5, at 7.) While Perkins is "outside walking around," he is "looking around making sure there[ are no] trucks coming anywhere near him" for safety purposes, as fuel trucks are "constant[ly]" pulling in and dropping fuel. (ECF No. 59-5, at 4; ECF No. 92-5, at 5.) Accordingly, Perkins was trained to "walk out in front" of tractor-trailers—rather than in between them—so that he "can make eye contact with the driver." (ECF No. 76-8, at 21.) Indeed, Perkins opined that it is "not very safe at all" to walk between trucks. (ECF No. 76-8, at 21.)

In addition to power washing the fuel lanes, Perkins also cleans out the trench drain on "an as-needed basis." (ECF No. 59-5, at 5.) If he "happen[s] to see water getting high [in the drain] after pressure washing one day," he will clean the drain soon thereafter. (ECF No. 59-5, at 5.) In general, Perkins cleans the trench drain "maybe twice a year." (ECF No. 59-5, at 5.)

To do so, he must lift up portions of the grate.[8] (ECF No. 62-3, at 8.) He pulls out one piece of the grate and places a scooping tool into the trench as far as he can. (ECF No. 76-8, at

---

[7] No evidence in the record demonstrates when the lanes were last power washed before the incident.

[8] Perkins "[y]ank[s] on [the grate] as hard as [he] can to try to get [it] up." (ECF No. 76-8, at 13.) He stated that he does not use any special tools to pull pieces of the grate up. (ECF

11.)  He then drags the tool toward himself and scoops the drain out.  (ECF No. 76-8, at 11–12.)
He continues—lifting one piece of the grate out at a time, scooping as much of the trench as he
can, and placing the grate piece back—until he has cleaned the entire trench.[9]  (ECF No. 76-8,
at 12.)  Contractors have also been employed to fix portions of the grate.  (ECF No. 76-8, at 15.)
Perkins testified that other than himself, no other Love's employee's duties include moving
pieces of the grate, although General Manager Chelsea Douglas stated that she had removed one
of the pieces in the past.  (ECF No. 76-8, at 14; ECF No. 92-1, at 4.)

### 4.     Possible Causes of the Missing Grate Piece

        According to Perkins, no other Love's employee generally touches the grate, "so the only
other conclusion would be that [the grate] broke."  (ECF No. 94-2, at 4.)  In Perkins's opinion, a
truck or trailer driving over the drain would not cause the grate to move because the pieces are
"very solid."  (ECF No. 76-8, at 15.)  Each piece of the grate, which Perkins described as "very
thick," weighs approximately fifty or sixty pounds.  (ECF No. 76-8, at 11, 13.)  Love's General
Manager Chelsea Douglas likewise testified that the grate "[is] not going to move" when a truck
drives over it because it is "kind of like built-in as part of the concrete."  (ECF No. 92-1, at 4.)
Indeed, she could not recall any instance in which "a truck had driven over the grate and caused
it to move."[10]  (ECF No. 92-1, at 4.)

---

No. 76-8, at 12.)  General Manager Chelsea Douglas, however, testified that Love's does employ
a tool to lift the grates.  (ECF No. 92-1, at 4.)

        [9] Perkins does not actually lift every piece of the grate however, as he can scoop "two or
three grates down" with his tool.  (ECF No. 76-8, at 12.)

        [10] The record reflects some ambiguity as to whether anyone has ever discovered the
missing piece of the grate.  Perkins testified that he did, at some point after the incident, find
broken pieces of the grate in the drain.  (ECF No. 76-8, at 16.)  However, Ronald Santicola was
not aware that any piece of the grate had been found.  (ECF No. 59-8, at 9.)  Whether a piece of
the grate has been found is relevant to, at the very least, establishing how the grate broke, and
thus whether Love's had constructive knowledge of the grate's condition.  Regardless, because,

Wallace's expert Ronald Santicola opined that although he had "no idea" precisely how the portion of the grate became missing, it was unlikely that it "broke off immediately before" Wallace tripped over it." (ECF No. 59-8, at 7.) This is so, stated Santicola, because the grate "would have broken into the trench," but there was "no indication that there w[ere] broken pieces of the grate underneath in the drain." (ECF No. 59-8, at 7.) "So if it did break, the trench had either been cleaned and that [piece had been] thrown out or it was never noticed prior to that." (ECF No. 59-8, at 7.) Ultimately, though, in his opinion, the Ruther Glen location's employees' "inability to follow [Love's] operations manuals requirements led to the hazard." (ECF No. 59-8, at 8.) Accordingly, he concluded that "Wallace was injured due to [a] lack of inspection and remediation of a clear and evident dangerous condition," *i.e.*, "[t]he visible opening in the . . . grate on top of the trench drain." (ECF No. 59-8, at 4.)

Love's corporate designee William Pat Stanton noted that this Love's location is busy. He estimated that approximately 40,000 trucks pass through the location per week. (ECF No. 76-12, at 7.) He posited, based on his experience, that a gap in the drench drain could be caused by the heavy traffic of 80,000-pound trucks rolling over it. (ECF No. 76-12, at 8.) "You have that much traffic over sheer time," he noted, the grate is "going to . . . wear and tear." (ECF No. 76-12, at 8.)

### 5.    Robert Glen's Testimony

Robert Glen—an employee of the Love's Ruther Glen location from approximately June 2018 to June 2019, (ECF No. 76-2, at 3–4; ECF No. 76-4, at 1)—testified that both General Manager Douglas and Operations Manager George were aware of the gap in the trench drain

---

as explained below, Wallace has presented sufficient evidence that Love's actually knew of the drain's condition, any ambiguity as to the existence of the missing piece of the grate is immaterial for the purposes of the Cross Motions.

prior to Wallace's accident, (ECF No. 76-2, at 5). Glen "became aware of gaps in th[e] trench drain during [his] training period with Love's in the summer of 2018." (ECF No. 76-4, at 1.) He, "and other Love's employees, conducted daily walk[-]throughs, of the diesel fuel lanes [while] doing the daily maintenance check[]list." (ECF No. 76-4, at 1.) Glen "observed the gaps in the trench drain while [he] cleaned and swept the diesel fuel lanes," which was within the "normal course of [his] duties. (ECF No. 76-4, at 1.) In fact, he "observed multiple gaps in the trench drain in diesel fuel lanes 18 through 20 prior to March 29, 2019." (ECF No. 76-4, at 2.) Glen "notated these gaps . . . during his walk[-]throughs," but "Love's took no action to correct the gaps in the trench drain after [he] reported . . . them." (ECF No. 76-4, at 2.) Glen stated that Chelsea Douglas, Doug Perkins, Kelli George, Love's Maintenance Department, and Love's as a whole all knew about the gaps in the trench drain prior to March 29, 2019. (ECF No. 76-4, at 2.)

Glen "reported the [grate] damage several times to . . . Chelsea [Douglas]." (ECF No. 76-2, at 6.) He further testified that George and Perkins knew about the damage to the grate as well. (ECF No. 76-2, at 6.) And he noted that he "had pictures of the water drain that was broken, and so [he] told [a Love's attorney] it would be best for her for Love's to settle." (ECF No. 76-2, at 6.) Glen averred that "[a]ny time something heavy," such as a truck, "rolls over a solid object, it gets a bend." (ECF No. 76-2, at 7.) "[A]nd it was over time that those bends started to snap off." (ECF No. 76-2, at 7.) Glen explained that part of the grate would break, it would "crack[] in half," so that it "separated," and "anything that [one] had on that grill would fall in the middle." (ECF No. 76-2, at 8.)

Glen stated that the grate had also broken in two locations aside from the area in front of pump 18—near pumps 21, and, he thought, 23. (ECF No. 76-2, at 7.) Glen further recalled the size of each break in the grate: "on pump 21–22, you had a half grate, half break;" on "pump

12

20–21, [there was a] missing grate piece;" and on pump "18–19 . . . [there was a] broken missing piece."[11] (ECF No. 76-2, at 9.) Although Glen could not recall when these openings in the grates appeared,[12] he "unequivocally" stated that the holes "did[ not] disappear" during his employment. (ECF No. 76-2, at 10.)

### 6. Love's Repairs the Grate at Some Point Prior to March 29

Love's did repair the grate prior to Wallace's accident on March 2019. At some point before that date (and likely in 2018),[13] Kelli George learned that "a piece of [the trench drain] was broken or missing,"[14] (ECF No. 92-6, at 5), so she submitted a work request. (ECF No. 59-9, at 1; ECF No. 92-6, at 4–5.) The invoice documenting the request reads: "WORK REQUESTED: We need to order a heavy duty grate 60[ inches] x 12[ inches]. I have contacted McKeever[15] and instructed us to have a work order and they will come out and take a look at this for us and then order it for us." (ECF No. 59-9, at 1.) Below that, the invoice reads:

> WORK COMPLETED: 08/20/2018: Inspect the drain on the last diesel island to find the grate is broken. Take measurements of the grate so a new one can be ordered. Reviewed work completed with Chelsea Douglas, Store Management. 10/08/2018: Receive work that the new grate has been installed at the store. Inspect to find the new grate was installed properly.

---

[11] Glen thought that other sections of the grate had possibly been broken as well but admitted that he was not sure. (ECF No. 76-2, at 9.) The three areas listed above, however, he "fe[lt] comfortable with" identifying as "definitively broken and in disrepair." (ECF No. 76-2, at 9–10.)

[12] Glen did, however, state that the Ruther Glen location was undergoing remodeling when he noticed the broken grates. (ECF No. 76-2, at 10.) According to his recollection, "[t]here was snow on the ground," so he speculated that it was likely December, January, or February. (ECF No. 76-2, at 11.)

[13] The invoice does not indicate when George first submitted the work request, and none of George's testimony placed into the record notes as such.

[14] George did not recall how Love's became aware of the broken drain. (ECF No. 92-6, at 5.)

[15] McKeever is the contractor Love's typically hires to repair the grate.

(ECF No. 59-9, at 1.)  The invoice is dated "12/5/2018" and notes that it was paid on January 7, 2019.  (ECF No. 59-9, at 1.)  It is unclear from the record which piece of the drain the contractor repaired.

### 7.    The Caroline County Building Official's Testimony

Another of Wallace's experts, Kevin Wightman, the Building Official in Caroline County, Virginia,[16] testified about the County's regulatory enforcement procedures.  Wightman stated that Caroline County has "wholeheartedly" adopted the Virginia Building Code.  (ECF No. 59-10, at 4.)  The record does, however, present a lack of clarity as to what constitutes the "Building Code."  Throughout his deposition, Wightman generally distinguished between the "building code" and the "property maintenance code."  (ECF No. 59-10, at 3.)  He stated that in general, the building code applies to "new construction, additions, [and] alterations" to a structure.  (ECF No. 59-10, at 4.)  Accordingly, once he issues a "final Certificate of Occupancy" after inspecting and permitting a structure, the building code ceases to apply, and the property maintenance code now governs the structure's condition.  (ECF No. 59-10, at 3.)  However, the Virginia Statewide Building Code ("Building Code") has three component Parts: Construction, Rehabilitation, and Maintenance.  *See* 13 Va. Admin. Code ch. 63.  That is, the Virginia Maintenance Code ("Maintenance Code") is subsumed *within* the Building Code but is distinct from the Virginia Construction Code.  For the purposes of this Memorandum Opinion, the Court will infer that Wightman's references to the "building code" are best understood as allusions to Construction Code.

---

[16] The Ruther Glen Love's location is located within Caroline County.

Although Caroline County has wholly adopted the Construction Code, it only enforces the Maintenance Code on a "complaint" basis. (ECF No. 59-10, at 4.)  That is, County officials typically do not conduct inspections for Maintenance Code violations *sua sponte*.  They must receive a complaint before doing so. (ECF No. 59-10, at 4.)  Once an official receives a complaint, they notify the premises owner and instruct the owner to repair the condition. (ECF No. 59-10, at 4.)  If the owner refuses to do so, an official may issue a formal notice of violation and provide the owner with a "deadline to abate." (ECF No. 59-10, at 4–5.)

Wightman had visited this Love's location "[n]umerous" times for professional reasons and was "[v]ery familiar" with it. (ECF No. 59-10, at 5; ECF No. 62-10, at 5.)  He had "never found Love's to be in violation of the building code;" that is, he had never issued Love's a notice of violation.[17] (ECF No. 59-10, at 4.)  He noted that his "history with Love's . . . is compliance" and that he had no reason to doubt that Love's fixed the grate as soon as it became aware of the gap. (ECF No. 59-10, at 5.)  Upon viewing the gap in the drain, Wightman acknowledged that it was "not compliant with the [Virginia] building code" because it posed a "life/safety issue" and would be a "trip/fall hazard." (ECF No. 59-10, at 3.)

### 8.   Wallace Obtains Robert Glen as a Witness

Because Love's seeks to exclude Robert Glen's testimony as improperly disclosed, the Court briefly recounts the facts relating to Wallace's procurement of his testimony.

---

[17] Although there appeared to be some confusion on the issue during his deposition, Wightman clarified that "when the condition arises on a property that is noncompliant with the maintenance code, that is a violation." (ECF No. 92-2, at 7.)  Prior to that clarification, Love's counsel and Wightman had suggested that a "violation" may not occur until after a County official issued a notice of violation (or perhaps even after the premises manager had exhausted their appeal process). (ECF No. 92-2, at 7.)  Once he clarified that the violation occurs when the hazardous condition manifests, Wightman noted that the maintenance code violation in this case occurred "as soon as this gap arose in the trench drain." (ECF No. 94-1, at 4.)

On June 25, 2021, in response to Wallace's interrogatories, Love's produced a list of employees at the Ruther Glen location, including Robert Glen, who had clocked into work on March 29, 2019. (ECF No. 60-1 ¶ 6.) Approximately one month later, Wallace's counsel emailed Love's regarding scheduling depositions of five Love's employees, one of whom was Robert Glen. (ECF No. 60-5, at 2; *see generally* ECF No. 60-1.) Wallace's counsel stated that while those employees "were not identified in the [D]efendant[']s initial discovery answers, as a manager and maintenance technician [counsel] believe[d] they would have discoverable information about the premises and defect in the trench drain." (ECF No. 60-5, at 2.) Love's counsel responded that she "w[ould] look into Robert Glen [and another employee]." (ECF No. 60-6, at 2.) She stated: "You understand that Robert Glen left work [on March 29] at 2 AM *prior* to the incident . . . ?" (ECF No. 60-6, at 2.)

On August 1, Love's counsel informed Wallace's counsel that she was "still in the process of confirming [these employees'] employment and availability. (ECF No. 60-8, at 2.) Roughly two weeks later, on August 17, Wallace submitted "Supplemental Initial Disclosures" to Love's, identifying Robert Glen as a person "likely to have discoverable information." (ECF No. 60-10, at 4–5.) The next day, Love's counsel informed Wallace's counsel that "Robert Glen" was "no longer employed with Love's," (ECF No. 60-11, at 2), and sent Wallace's counsel Glen's contact information a few days thereafter, (ECF No. 60-12, at 2).

On September 17, Wallace's counsel spoke with Glen for the first time. (ECF No. 60-1 ¶ 16.) Glen recounted his knowledge of the grate as detailed above and stated that "he had relayed the same information to [Love's] attorney in a prior telephone call." (ECF No. 60-1 ¶ 16.) Wallace's counsel requested that he sign an affidavit in October, and Glen "eventually signed a declaration on November 22." (ECF No. 60-1 ¶ 17.)

16

On November 24, Wallace's counsel sent Fifth Supplemental Initial Disclosures to Love's counsel which identified that Glen did indeed possess relevant information. (ECF No. 60-13, at 3, 14.) The disclosures summarized this information, stating that "Robert Glen has knowledge regarding the existence of gaps in the trench drain at the truck stop prior to March 29, 2019, Love's awareness of gaps in the trench drain, inspections identifying these gaps, and Love's inaction regarding gaps in the trench drain." (ECF No. 60-13, at 3.)

Love's deposed Glen on December 2, 2021,[18] (ECF No. 76-2, at 1), and discovery in this matter closed on December 13, 2021, (ECF No. 54, at 4.)

### B.   Procedural Background

Wallace originally filed suit in the Henrico County Circuit Court, and Love's properly removed the case to this Court.[19] (ECF No. 1, at 1; ECF No. 1-1, at 1.) Wallace filed her Amended Complaint on June 23, 2021. (ECF No. 14.) The Amended Complaint alleges three Counts against Love's:

**Count I:  Negligence *Per Se***

**Count II:  Negligence**

**Count III:  Premises Liability[20]**

---

[18] At Glen's deposition, as the parties discussed the possibility of playing a videotaped copy of Glen's deposition at trial, Love's counsel noted that he "certainly . . . welcome[d] Mr. Glen's participation at trial to the extent that he has relevant evidence." (ECF No. 60-18, at 8.)

[19] Wallace also included Ryan, LLC as a defendant in her original Complaint. (ECF No. 1-1, at 2.) Wallace voluntarily moved to dismiss Ryan from this action, and the Court dismissed Ryan, LLC as a party to this action on April 26, 2021. (ECF No. 5.)

[20] Although Wallace styles Counts II and III as separate causes of action, premises liability is simply a theory under which one can show negligence of a premises owner. The Court thus considers the allegations in these Counts as stating one substantive cause of action for negligence under a theory of premises liability.

Love's filed a Partial Motion to Dismiss, (ECF No. 18), arguing that Wallace had failed to state a claim under a negligence *per se* theory, (ECF No. 19).  On December 14, 2021, Love's moved for summary judgment on all Counts in the Amended Complaint, and on December 23, 2021, Wallace moved for partial summary judgment on one element of her common law negligence claim and certain elements of her negligence *per se* claim.  (ECF Nos. 58, 61).  On January 6, 2022, the Court noted that Love's Motion for summary judgment addressed all issues it raised in its Partial Motion to Dismiss.  (ECF No. 89, at 1.)  In the interest of judicial economy, the Court denied Love's Partial Motion to Dismiss as moot, noting that it would instead address the issues of law raised in that motion in a forthcoming Memorandum Opinion addressing the instant Cross-Motions.  (ECF No. 89, at 2.)

Both parties have responded to each other's Motions, (ECF Nos. 79, 92), and both parties have replied, (ECF Nos. 87, 94).  For the following reasons, the Court will grant Wallace's Partial Motion for Summary Judgment and will deny Love's Motion for Summary Judgment.

## II.  Standard of Review:  Motion for Summary Judgment

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).

"A fact is material if the existence or non-existence thereof could lead a [finder of fact] to different resolutions of the case." *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 628 (E.D. Va. 2016) (citing *Liberty Lobby*, 477 U.S. at 248).  Once a party has properly filed evidence supporting its motion for summary judgment, the nonmoving party may not rest upon mere

allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues

for trial. *Celotex Corp.*, 477 U.S. at 322–24. The parties must present these in the form of

"depositions, documents, electronically stored information, affidavits or declarations,

stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ.

P. 56(c)(1)(A).

A court views the evidence and reasonable inferences drawn therefrom in the light most

favorable to the nonmoving party. *Liberty Lobby*, 477 U.S. at 255. Whether an inference is

reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia*

*Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995) (citation omitted). Nonetheless,

the nonmoving "party is entitled 'to have the credibility of his [or her] evidence as forecast

assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (*en banc*) (quoting

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

In the end, the non-moving party must do more than present a scintilla of evidence in

its favor.

> Rather, the non-moving party must present sufficient evidence such that reasonable
> jurors could find by a preponderance of the evidence for the non-movant, for an
> apparent dispute is not genuine within contemplation of the summary judgment rule
> unless the non-movant's version is supported by sufficient evidence to permit a
> reasonable [finder of fact] to find the facts in his [or her] favor.

*Sylvia Dev. Corp.*, 48 F.3d at 818 (internal quotations, citations, and alterations omitted). The

ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient

evidence favoring the nonmoving party for a [finder of fact] to return a verdict for that party. If

the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

Where the court is faced with cross-motions for summary judgment, as in the instant case, the

court must review each motion separately on its own merits.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

### III.  Analysis

### A.    The Court Will Not Exclude Robert Glen's Testimony

On December 8, 2021, Love's filed a Motion *in Limine* to, *inter alia*, exclude all testimony offered by Robert Glen.  (ECF Nos. 53, 54.)  Because Glen's testimony is crucial to the Court's consideration of summary judgment, the Court will first address whether it should exclude Glen's testimony as a sanction pursuant to Federal Rule of Civil Procedure 37(c)(1).[21] For the reasons that follow, the Court will deny Love's Motion *in Limine*, (ECF No. 53), as it relates to Robert Glen.

### 1.    Legal Standard:  Federal Rules of Civil Procedure 26 and 37(c)(1)

The Federal Rules of Civil Procedure mandate that in general, parties must:

> without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Fed. R. Civ. P. 26(a)(1)(A)(i).  "The purpose of Rule 26(a) is to allow the parties to adequately prepare their cases for trial and to avoid any unfair surprise."  *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014).  Further,

> A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the

---

[21] On January 27, 2022, the Court denied Love's Motion *in Limine* in the interest of pretrial management.  (ECF No. 113).  Because the merits of this Motion bear on whether summary judgment should be entered on behalf of Love's, the Court reopens and addresses the merits of Love's Motion *in Limine* to exclude Glen's testimony.

additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ. P. 26(e)(1)(A).

Federal Rule of Civil Procedure 37 provides for sanctions based on certain discovery violations. Relevant here:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). To determine whether a failure to disclose was harmless, this Court should consider five non-mandatory factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (quoting *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596–97 (4th Cir. 2003)). "The first four factors 'relate mainly to the harmlessness exception,' whereas the last factor 'relates primarily to the substantial justification exception.'" *Wood v. Credit One Bank*, No. 3:15cv594, 2017 WL 11503875, at *3 (E.D. Va. Sept. 21, 2017) (quoting *S. States*, 318 F.3d 592, 597 (4th Cir. 2003)). District courts possess "broad discretion" to "impos[e] . . . sanctions for discovery abuses, as part of their case-management authority." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014); *see Holmes v. General Dynamics Mission Systems, Inc.*, 835 F. App'x 688, 691 (4th Cir. 2020) ("We accord such discretionary decisions great deference.").

21

### 2. The Court Will Decline to Impose Sanctions with Respect to Glen's Testimony

The Court will not exclude Glen's testimony. Love's contends that Wallace "failed to disclose 'the subjects of the information' that Mr. Glen allegedly knew . . . until November 24, 2021," "three months after learning [about] such information and less than three weeks before the close of discovery." (ECF No. 54, at 4.) "While Love's was able to obtain a deposition of Mr. Glen," it avers that it "has not been able to conduct additional discovery to either confirm or discredit Mr. Glen's testimony" because it was notified of the subjects of Glen's knowledge so soon before discovery closed. (ECF No. 54, at 4–5.) These arguments fail.

#### i. Wallace's Disclosures Complied with Rule 26

As an initial matter, Wallace did not fail to properly disclose the subjects of the information known to Glen. In August 2021, Wallace's counsel submitted supplemental disclosures to Love's, noting that Glen—among others—"likely" possessed discoverable information. (ECF No. 60-10, at 4–5.) And on November 24, 2021—still well within the discovery period, impending holiday notwithstanding—Wallace's counsel notified Love's counsel that Glen *did* indeed possess relevant information.[22] (ECF No. 60-13, at 3, 14.) In that disclosure, Wallace's counsel further clarified that "Robert Glen has knowledge regarding the existence of gaps in the trench drain at the truck stop prior to March 29, 2019, Love's awareness of the gaps in the trench drain, inspections identifying these gaps, and Love's inaction regarding gaps in the trench train." (ECF No. 60-13, at 3.) Wallace's counsel also noted that he

---

[22] Although Wallace did not include Glen's address or telephone number in its disclosures, Love's does not argue that the Court should exclude his testimony on this basis. (*See generally* ECF No. 54.) And indeed, any such failure would be harmless, because *Love's* provided Wallace with Glen's contact information. (ECF No. 60-12, at 2.)

"expect[ed] to use Robert Glen in support of [Wallace's] claims in this case." (ECF No. 60-13, at 3.)

The dispute here closely resembles another that came before this Court in *Wood v. Credit One Bank*, No. 3:15cv594, 2017 WL 11503875, at *3 (E.D. Va. Sept. 21, 2017). There, Defendant Credit One Bank ("Credit One") included one of its witnesses—Sgt. Woodson—in the portion of its initial disclosures that identified "[a]ll individuals as potential witnesses by any other party." *Id.* at *2 (alteration in original). Roughly a month later, in its responses to Plaintiff Wood's interrogatory question "asking Credit One to '[i]dentify all persons or entities known to [it] who have knowledge of the facts relevant to the case,' Credit One identified, among others," Sgt. Woodson. *Id.* at *3 (first alteration in original). Wood argued that such disclosures ran afoul of Rule 26 because "[t]here is a big difference between knowing of a person with putative knowledge and knowing that an opposing party actually intended to use such a person at trial." *Id.* (alteration in original). But this Court rejected that contention, reasoning that "Rule 26 does not entitle Wood to know . . . which witnesses Credit One intends to use at trial," and concluding that both of Credit One's disclosures satisfied Rule 26. *Id.*

Similar principles lead the Court to conclude that Wallace's disclosures did not violate Rule 26. Just as Credit One's identification of Sgt. Woodson as a "potential witness" sufficed, so too does Wallace's disclosure of Glen as an individual "likely" to possess pertinent information.[23] In any event, Wallace plainly complied with Rule 26 when she disclosed that

---

[23] The Court also notes that both here and in *Wood*, the complaining party was well aware of the pertinent witness's "general connection to the case." *Wood*, 2017 WL 11503875, at *1. Love's has known throughout this litigation that Robert Glen had worked a shift at the Ruther Glen location on March 29. (ECF No. 60-1 ¶ 6.) Even after Love's counsel expressed her skepticism that Glen would possess relevant information, Wallace's counsel articulated that he still believed Glen may be a valuable witness and that he wished to depose him. (ECF No. 60-7, at 2.)

Robert Glen did possess relevant information and summarized that information in her supplemental disclosures—all within the regular discovery period.  In short, Wallace did not violate Rule 26 with respect to her disclosures about Robert Glen.

### ii. Wallace's Disclosures Did Not Cause Love's Harm

Even if the Court assumed that Wallace had run afoul of Rule 26, each factor for this Court to consider nonetheless points toward harmlessness.  First, a close look at the timeline of events underscores that Love's should not be surprised by Wallace's reliance on Glen.  On July 21, 2021, Wallace's counsel emailed Love's regarding the scheduling of depositions for five Love's employees—one of whom was Robert Glen.  (ECF No. 60-5, at 2.)  A few days later, Love's counsel responded that she "w[ould] look into Robert Glen" and another employee.  (ECF No. 60-6, at 2.)  Wallace's counsel then supplemented her disclosures a few weeks later to in part notify Love's that Glen "likely" possessed pertinent information.  (ECF No. 60-10, at 4–5.)  And, as articulated above, Wallace's counsel quite clearly identified the subjects of Glen's knowledge in his November 24 supplemental disclosures.  (ECF No. 60-13, at 3, 14.)  About a week after that disclosure, Love's deposed Glen.  (ECF No. 76-2, at 1.)  In other words, throughout the discovery window, Wallace's counsel consistently—and, at times, rather explicitly—signaled his belief that Glen possessed relevant knowledge.  Love's was able to act on this knowledge by deposing Glen.  It should have been no surprise that Glen would play a role in Wallace's case, and that he may possess information about the incident.[24]

Second, and relatedly, Love's had ample opportunities to cure any potential harm it would have suffered due to what it perceives as a late (albeit technically timely) disclosure.

---

[24] Interestingly, Love's counsel did not seem to express concern during Glen's deposition about any unfair surprise, as he noted that he "welcome[d] Mr. Glen's participation at trial to the extent that he has relevant evidence."  (ECF No. 60-18, at 8.)

Love's had three weeks after November 24 in which to conduct additional discovery, and eleven days to do so after Glen's December 2 deposition. The Court understands Love's suggestion that a few weeks may not be sufficient time to fulsomely investigate a witness and engage in additional discovery related to that witness. But litigants in such a scenario have a straightforward remedy, one much less draconian than sanctions: they may move to extend the discovery deadline to allow more time to conduct additional discovery. Here, Love's did not file such a motion. Instead, it simply waited for the discovery period to expire and only then moved for a remedy. In light of Love's failure to take advantage of other opportunities to cure any purported harm, the Court finds that the second factor weighs towards harmlessness as well.

Third, allowing Glen's testimony into evidence would not disrupt the trial. Trial in this matter is currently scheduled to begin on September 14—two months from now. What is more, the Court clearly notified the parties during the March 15, 2022 summary judgment hearing that it would allow Wallace to introduce his testimony at trial. (ECF No. 119, at 8 ("[Glen's testimony is] coming in. You were not unfairly surprised. It's totally coming in.").) This case does not, in other words, present a scenario in which a party has identified a witness on the eve of trial. Thus, the third factor also weighs in Wallace's favor.

Fourth and finally with respect to harmlessness, Glen's testimony, if believed, provides the most direct evidence that Love's knew of a dangerous condition on its premises.[25]

---

[25] Moreover, Wallace's disclosure late in the discovery period was likely justified. Wallace's counsel consistently communicated to opposing counsel his interest in deposing Glen, as he was likely to possess pertinent information, and Love's took several weeks to provide Wallace with Glen's contact information. (ECF No. 60-5, at 2; ECF No. 60-12, at 2.) Although Wallace's counsel did not speak with Glen until roughly a month after receiving his contact information, (ECF No. 60-12, at 2; ECF No. 60-1 ¶ 16), he seems to have promptly followed up with Glen after their first conversation to request that Glen sign an affidavit, (ECF No. 60-1 ¶ 17.) Wallace's counsel then informed opposing counsel of the subjects of Glen's information a mere two days after Glen signed his declaration. (ECF No. 60-1 ¶ 17; ECF No. 60-13, at 3.) In other words, the timeline here suggests no malfeasance on behalf of Wallace's counsel.

In short, Wallace fully complied with Rule 26. But even if she had not, such a failure would have been harmless and likely justified.

### B.   The Court Will Grant Wallace's Partial Motion for Summary Judgment

Wallace moves for summary judgment on four issues, the first of which relates to her negligence claim and the latter three of which relate to her negligence *per se* claim: (1) Love's owed Wallace a duty of care "owed by a premises owner to an invitee;" (2) in running afoul of the Virginia Maintenance Code, Love's violated a statute enacted for public safety; (3) "Wallace belongs to a class of persons for whose benefit the Virginia Maintenance Code was enacted;" and, (4) Wallace's injury "is a harm of the type against which the Virginia Maintenance code was designed to protect." (ECF No. 62, at 3.) Because Wallace has demonstrated that no material facts with respect to these issues are disputed and that she is entitled to judgment as a matter of law as to all of them, the Court will grant Wallace's Partial Motion.

### 1.   Love's Owed Wallace a Duty to Exercise Ordinary Care

"Under Virginia law, a property owner owes an invitee a duty to exercise ordinary care to 'render [the premises] reasonably safe for the invitee's visit.'"[26] *Sedar v. Reston Town Ctr. Property, LLC*, 988 F.3d 756, 762 (4th Cir. 2021) (alteration in original) (quoting *Fultz v. Delhaize Am., Inc.*, 677 S.E.2d 272, 274 (Va. 2009)). A customer shopping at a business is perhaps the paradigmatic example of an invitee for purposes of premises liability. *See Clark v. Chapman*, 385 S.E.2d 885, 892 (Va. 1989)). Here, the record demonstrates (and the parties do not dispute) that Wallace was an invitee at the Ruther Glen Love's location. She was waiting to refuel her tractor-trailer at a diesel pump, and she entered the Love's convenience store to

---

[26] However, as the Court will discuss in more detail below, a premises owner need not "provide notice to an invitee of a dangerous condition that is 'open and obvious.'" *Sedar*, 988 F.3d at 762 (quoting *Fultz*, 677 S.E.2d at 274).

purchase coffee.  (ECF No. 76-6 ¶¶ 5–8.)  Accordingly, the Court will grant Wallace's Partial

Motion on this issue and will enter an Order in part articulating that Love's owed Wallace a duty

to exercise ordinary care to keep its premises safe and warn invitees of non-obvious dangers.

### 2.    Wallace Is Entitled to Summary Judgment on Two Elements of Negligence *Per Se*

Turning now to certain elements of Wallace's negligence *per se* claim, the Court first

concludes that Love's violated the Virginia Maintenance Code, and finds that the Maintenance

Code was enacted for public safety.  For the reasons stated below, the Court explains why

Wallace belongs to the intended beneficiary class of the Maintenance Code, and why her fall was

the type of injury the Code was designed to prevent.

### a.    Legal Standard:  Negligence *Per Se*

To prevail on a claim for negligence, a plaintiff must establish four elements:  a legal

duty owed by the defendant, a breach of that duty by the defendant, and "proximate causation

resulting in damage." *Atrium Unit Owners Ass'n v. King*, 585 S.E.2d 545, 548 (Va. 2003). "The

doctrine of negligence [*per se*] represents the adoption of 'the requirements of a legislative

enactment as the standard of conduct of a reasonable [person]." *Kaltman v. All Am. Pest Ctrl.,

Inc.*, 706 S.E.2d 864, 872 (Va. 2011) (second alteration in original) (quoting *Butler v. Frieden*,

158 S.E.2d 121, 122 (Va. 1967)).  In other words, a plaintiff may show that the defendant acted

negligently if she prevails on all three prongs of negligence *per se*.

"The elements of negligence [*per se*] are well established.  First, the plaintiff must prove

that the defendant violated a statute enacted for public safety." *Id.*  "Second, the plaintiff must

belong to the class of persons for whose benefit the statute was enacted, and demonstrate that the

harm that occurred was of the type against which the statute was designed to protect." *Id.*

"Third, the statutory violation must be a proximate cause of plaintiff's injury." *Id.*  "The first

and second of these elements are issues of law to be decided by a trial court, while the third
element is generally a factual issue to be decided by the trier of fact." *Id.*

> **b.**   **Love's Violated the Virginia Maintenance Code**

Pursuant to 13 Va. Admin Code § 5-63-520(B)(4),[27] (hereinafter "(B)(4)"), "[a]ll
sidewalks, walkways, stairs, driveways, parking spaces, and similar spaces regulated under the
[Virginia Construction Code] shall be kept in a proper state of repair and maintained free from
hazardous conditions." The parties do not dispute—and the record clearly establishes—that the
trench drain was not in a "proper state of repair" when Wallace's injury occurred. (*See generally*
ECF No. 59.)

Rather than contest the adequacy of the grate's condition, Love's argues that it could not
have violated subsection (B)(4) because it did not have notice of the broken portion before
Wallace's injury occurred. (ECF No. 92, at 5.) In other words, Love's contends that a violation
under (B)(4) does not occur until an inspector provides the property owner notice of the defect,
because the Maintenance Code implicitly prohibits a "failure of *upkeep*[,] not a condition for
which the cause is unknown." (ECF No. 92, at 8.) In support, Love's offers the following
hypothetical:

> [I]f a truck driver drops his or her phone through the trench drain, removes the
> grating to retrieve the phone, and drops the grating into the deep trench without
> bothering to put it back on, the hazard arose not because of Love's failure, but
> because of a third party's actions.

(ECF No. 92, at 8.) Love's argument founders.

---

[27] In her Memorandum in Support of her Partial Motion for Summary Judgment, Wallace
also points to 13 Va. Admin Code § 5-63-520(B)(7), which provides that "[t]he exterior of a
structure shall be maintained in good repair. . . [and] structurally sound." (ECF No. 62, at 7.)
However, as Wallace acknowledged at the summary judgment hearing, subsection (B)(4) more
plainly applies here. (ECF No. 119, at 29.) Thus, the court need not decide whether (B)(7) also
establishes a standard of care as to the grate.

To begin, the text of (B)(4) does not contain any reference to a knowledge requirement. In order to surmise what standard of care the General Assembly wished to impose under (B)(4), the Court need only look to the plain text of the regulation: "All sidewalks, walkways, stairs, driveways, parking spaces, and similar spaces . . . *shall be kept* in a proper state of repair and *maintained* free from hazardous conditions." 13 Va. Admin Code § 5-63-520(B)(4) (emphasis added). Nowhere here, nor in any surrounding section or subsection, do the regulations require that a party have *knowledge* of a defect. The upshot is clear: a violation of (B)(4) occurs as soon as the pertinent area falls into an "[im]proper state of repair" or poses a "hazardous condition." *Id.*

To impute a knowledge requirement into (B)(4) where none is extant would also undermine the key purpose of negligence *per se*: permitting legislatures to raise the standard of care from the default common law threshold in certain instances. *See Kaltman*, 706 S.E.2d at 872 ("The doctrine of negligence [*per se*] represents the adoption of 'the requirements of a legislative enactment as the standard of conduct of a reasonable [person]." (second alteration in original) (quoting *Butler*, 158 S.E.2d at 122)). Reading a knowledge requirement into (B)(4) would collapse negligence *per se* and common law negligence such that the two causes of action would contain functionally identical elements. That would, of course, render (B)(4) meaningless as a way to impose upon property owners a heightened duty to ensure that walkways and similar spaces maintain in good repair.[28] Without clear indications in the text or elsewhere that the General Assembly simply meant to codify common law through (B)(4), the Court will read the

---

[28] Buttressing this point, Wallace's Expert Kevin Wightman clarified that a violation arises "when the [noncompliant] condition arises," not when the inspector provides the property owner notice. (ECF No. 92-2, at 7.)

subsection according to its plain meaning: without a requirement that Love's knew about an unrepaired condition.

This approach is in step with a similar case decided by the Supreme Court of Virginia. In *MacCoy v. Colony House Builders, Inc.*, an electrician completed work on a family's house. 387 S.E.2d 760 (Va. 1990). "[T]he county building inspector inspected the MacCoy House and noted that more service cable needed to be installed in the electrical panel box." *Id.* at 761. The electrician "[a]pparently . . . remedied the problem because the inspector approved the electrical work after a subsequent inspection." *Id.* However, a few years later, the house caught fire. *Id.* "Experts testified that the fire resulted from the installation of the electrical service cable in violation of the National Electrical Code, which is incorporated in the Uniform Statewide Building Code"—which had both been adopted by Virginia. *Id.* Although the primary pertinent issue before the court involved whether a construction company could be liable for the electrician's negligence under the "wrongful *per se*" doctrine, the *MacCoy* court had no trouble assuming the electrician *had*, indeed, violated the Building Code. The court noted that it "agree[d] with the MacCoys that the [electrician's] violation of the Building Code, like the violation of any statute enacted to protect health, safety, and welfare, is negligence *per se*." *Id.* at 763. This passage in *MacCoy* signals the understanding of the Virginia Supreme Court that ordinarily, a violation of the Building Code does not require knowledge of a defective condition on behalf of the negligent actor. This Court agrees with such an understanding.

In sum, by showing that Love's failed to keep the grate on its premises in good repair at the time of the accident—a fact Love's does not dispute—Wallace has established the Love's has violated Section 5-63-520(B)(4) of the Virginia Maintenance Code.

## c.    The Virginia Maintenance Code Was Enacted for Public Safety

Love's does not dispute that the Virginia Maintenance Code was enacted for the purpose of public safety. (*See* ECF No. 92, at 6–8; *see generally* ECF No. 59.) This is for good reason: "Virginia courts have consistently held that a violation of a building code . . . is negligence *per se*." *Guy v. Tidewater Investment Props.*, No. L-95-1194, 1996 WL 33497700, at *6 (Va. Cir, 1996); *accord McGuire v. Hodges*, 639 S.E.2d 284, 288 (Va. 2007); *O'Neill v. Windshire-Copeland Assocs., L.P.*, 595 S.E.2d 281, 611 (Va. 2004) ("The [Newport News Building Code] protects no specific class; it is the public in general that benefits from its provisions."); *MacCoy*, 387 S.E.2d 760, 763 (Va. 1990) ("[T]he violation of the Building Code, like the violation of any statute enacted to protect public health, safety, and welfare, is negligence *per se*."); *Va. Elec. & Power Co. v. Savoy Const. Co., Inc.*, 294 S.E.2d 811, 817 (Va. 1982) ("The dominant purpose of the [Uniform Statewide] Building Code . . . is to provide comprehensive protection of the public health and safety."); *In re All Pending Chinese Drywall Vases*, 2010 WL 7378659, at *6 (Va. Cir. Ct. 2010) ("Application of the *McGuire* holding confirms that plaintiffs may properly refer to the building code for the required statutory violation" under negligence *per se*); *Schaefer v. Tectonics, II, Ltd.*, No. CL07000313, 2008 WL 8200728, at *3 (Va. Cir. Ct. 2008); *Jenkins v. Daniels Inst. of Holistic Health, Inc.*, No. CL00-1401, 2003 WL 21754953, at *1 (Va. Cir. Ct. 2003). The Maintenance Code is a specific section of the Building Code. Thus, Wallace has successfully established that the provision violated by Love's—Section 5-63-520(B)(4)—is a statute enacted for public safety.

    **d.**  **Wallace Falls Within the Class of Persons Protected by the**
        **Virginia Maintenance Code**

   Likewise, Wallace falls within the intended beneficiary class of the Maintenance Code.

In making such a determination, the Court looks first to the most obvious indication of the

regulation's intended breadth:  the Maintenance Code's statement of purpose and scope.  Title

13, section 5-63-460 of the Virginia Administrative Code states that in adopting the Maintenance

Code, the Virginia General Assembly's goal was to empower the Virginia Board of Housing and

Community Development ("VBHCD") to adopt and promulgate building regulations "to ensure

the protection of the *public* health, safety[,] and welfare."  13 Va. Admin. Code § 5-63-460

(emphasis added).  However, in the following sentence, the section notes that "the purpose of

this [C]ode is to protect the health, safety[,] and welfare of the *residents of the Commonwealth of*

*Virginia.*"  *Id.* (emphasis added).  The principal question, then (and the one highlighted by

Love's) is whether the Maintenance Code was intended to apply to the public generally, or only

to Virginia residents.

   "In interpreting [a] statute, 'courts apply the plain meaning . . . unless the terms are

ambiguous or applying the plain language would lead to an absurd result.'"  *Baker v.*

*Commonwealth*, 733 S.E.2d 642, 644 (Va. 2012) (second alteration in original) (quoting *Boynton*

*v. Kilgore*, 623 S.E.2d 922, 926 (Va. 2006)).  "A statute is considered ambiguous 'if the text can

be understood in more than one way or refers to two or more things simultaneously or when the

language is difficult to comprehend, is of doubtful import, or lacks clearness or definiteness.'"

*Id.* (quoting *Boynton*, 623 S.E.2d at 926 n.8).

   The Court acknowledges that a plain reading of the Maintenance Code might support

Love's argument that it was only intended to protect Virginia residents.  The statement of

purpose and scope does, after all, state that "the purpose of this code is to protect the health,

safety and welfare of the residents of the Commonwealth of Virginia." 13 Va. Admin. Code
§ 5-63-460. However, immediately before that passage, the General Assembly pronounces that
the Maintenance Code's function is to empower VBHCD to enact regulations that generally
protect the "public health, safety and welfare." In light of this ambiguity, the Court finds that the
meaning of the Maintenance Code's statement of purpose and scope is not particularly "plain" on
the face of that provision's text.

In addition, the most "plain" interpretation propounded by Love's of the statement of
purpose and scope would yield patently absurd results. Consider what may be an obvious
hypothetical: two individuals step onto the premises of a business whose sidewalks contain
hazardous holes. One resides in Virginia, the other in North Carolina. Both individuals trip, fall,
and suffer severe injuries because of the holes. Neither person uncovers evidence that the
business owner knew about the condition. Under Love's preferred interpretation, the Virginia
resident could still be compensated for her injuries pursuant to negligence *per se* sheerly because
of her residency status, while the North Carolina resident could not be. The Court finds it
difficult to believe that the General Assembly intended the Maintenance Code to shield
individuals from hazardous conditions on publicly accessible premises based on where those
individuals lived.

Indeed, such an interpretation would likely run afoul of the United States Constitution's
Privileges and Immunities Clause. This Clause provides: "The Citizens of each State shall be
entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV,
§ 2, cl. 1. "The object of the Privileges and Immunities Clause is to strongly constitute the
citizens of the United States as one people by placing the citizens of each State upon the same
footing with citizens of other States, so far as the advantages resulting from citizenship in those

States are concerned." *McBurney v. Young*, 667 F.3d 454, 462 (4th Cir. 2012) (cleaned up).  To

that end, the Clause generally "bar[s] discrimination against citizens of other States where there

is no substantial reason for the discrimination beyond the mere fact that they are citizens of other

States." *Id.* (quoting *Saenz v. Roe*, 526 U.S. 489, 502 (1988)).

The United States Supreme Court has articulated a two-step framework for determining

whether a residency classification violates the Privileges and Immunities Clause:

> First, the activity in question must be sufficiently basic to the livelihood of the
> nation as to fall within the purview of the Privileges and Immunities Clause . . . .
> Second, if the challenged restriction deprives nonresidents of a protected privilege,
> [the court] will invalidate it only if [it] conclude[s] that the restriction is not closely
> related to the advancement of a substantial state interest.

*Id.* (alterations in original) (quoting *Supreme Court of Va. v. Friedman*, 487 U.S. 59, 64 (1988)).

Only certain activities are "sufficiently basic to the livelihood of the nation." *Id.*  Among these

"fundamental rights" is the right to access the courts. *Id.*

Wholly foreclosing a substantive cause of action interferes an individual's access to

courts. *Estate of Smith v. Marasco*, 318 F.3d 497, 511 (3d Cir. 2003) ("[O]nly prefiling conduct

that either prevents a plaintiff from filing suit or renders the plaintiff's access to the court

ineffective or meaningless constitutes a constitutional violation."); *Barrett v. United States*, 798

F.2d 565, 575 (2d Cir. 1986) ("Unconstitutional deprivation of a cause of action occurs when

government officials thwart vindication of a claim by violating basic principles that enable civil

claimants to assert their rights effectively.").  The Court sees no basis to find that the General

Assembly would have any substantial state interest in restricting the protections of its

Maintenance Code only to those who reside in Virginia, or that such a restriction is closely tied

to any state interest.  In other words, the canon of constitutional avoidance strongly cautions

against Love's proposed interpretation of the Virginia Maintenance Code. *United States v.*

*Simms*, 914 F.3d 229, 251 (4th Cir. 2019) (noting that courts are "obligated to construe [a] statute to avoid [constitutional] problems" if such a reading is "fairly possible" (alterations in original) (quoting *INS v. St. Cyr*, 533 U.S. 289, 300 (2001))).

In sum, the Virginia Maintenance Code was enacted to benefit the general public, not only residents of the state. The Code's statement of purpose is ambiguous, and a restrictive interpretation would lead to absurd results and likely a constitutional clash. Wallace is a member of the general public that the Code was enacted to benefit; therefore the Court will grant Wallace Partial Motion for summary judgment on this element of negligence *per se.*

### e. Wallace's Injury Was the Type Against Which (B)(4) Was Meant to Protect

Lastly, the injury Wallace suffered was plainly the type that (B)(4) was meant to prevent. As Love's seems to not contest, a trip and fall into an unrepaired feature of the premises falls squarely within the ambit of the Maintenance Code. *Cf. Va. Elec. & Power Co.*, 294 S.E.2d at 817 (concluding that the "explosion and fire" in that case "were dangers [the Building Code] was designed to prevent").

Thus, the Court will grant Wallace's Partial Motion for Summary Judgment. The Court will enter an Order articulating that (1) Love's owed Wallace a duty of care "owed by a premises owner to an invitee;" (2) in running afoul of the Virginia Maintenance Code, Love's violated a statute enacted for public safety; (3) "Wallace belongs to a class of persons for whose benefit the Virginia Maintenance Code was enacted;" and, (4) Wallace's injury "is a harm of the type against which the Virginia Maintenance code was designed to protect." (ECF No. 62, at 3.) As to the element of proximate cause, that factual inquiry will be left to the factfinder.

35

### C.    The Court Will Deny Love's Motion for Summary Judgment

In addition to moving for summary judgment on Wallace's negligence *per se* claim—on which, as discussed, Wallace (and not Love's) prevails—Love's moves for summary judgment on two additional grounds. First, it argues that Wallace has failed to present ample facts to prevail under common law negligence because she has not shown that Love's had actual or constructive notice of the broken grate, and she "has failed to establish an applicable standard of care and a deviation from the standard of care." (ECF No. 59, at 12.) Second, Love's claims that Wallace was contributorily negligent as a matter of law. For the reasons stated below, none of these contentions succeed.

### 1.    Love's Is Not Entitled to Summary Judgment on Wallace's Common Law Negligence Claim

#### a.    Legal Standard: Negligence in Virginia

Common law negligence in Virginia consists of four elements: a legal duty owed by the defendant, a breach of that duty by the defendant, and "proximate causation resulting in damage." *Atrium Unit Owners Ass'n*, 585 S.E.2d at 548. A premises owner "owes a duty to its invitee (1) to use ordinary care to have the premises in a reasonably safe condition for the invitee's use consistent with the invitation, and (2) to use ordinary care to warn its invitee of any unsafe condition that was known, or by the use of ordinary care should have been known, to the owner." *Fobbs v. Webb Bldg. Ltd. P'ship*, 349 S.E.2d 355, 357 (Va. 1986). "In premises liability cases" such as this, "the plaintiff must introduce evidence of the responsible person's actual or constructive knowledge of a defective condition on the premises to establish a *prima facie* case of negligence." *Grim v. Rahe, Inc.*, 434 S.E.2d 888, 889 (Va. 1993) (citing *Roll 'R' Way Rinks, Inc. v. Smith*, 237 S.E.2d 157, 161 (Va. 1977)).

36

As discussed above, Wallace has demonstrated that as a matter of law Love's owed her the traditional duties afforded an invitee under the law. Thus, the only remaining question this Court must resolve with respect to common law negligence is whether Wallace has raised a triable issue of fact as to whether Love's breached those duties. She has.

### b. Wallace Has Established a Genuine Issue of Material Fact as to Whether Love's Breached Its Duty of Ordinary Care

On this issue, Love's contends that Wallace has not presented adequate evidence to show that Love's actually or constructively knew about the grate's condition. (ECF No. 59, at 10–12.) As Wallace points out, the argument with respect to actual knowledge appears to rest entirely on whether the Court excludes Robert Glen's testimony.[30] (ECF No. 79, at 28.) That is because Glen's testimony provides clear, direct evidence that Love's employees—including managers— knew about several holes in the trench drain grate, including that into which Wallace fell.[31] (ECF No. 76-4, at 2.) (ECF No. 59-9, at 1.) Such a factual dispute renders summary judgment for Love's on Wallace's common law negligence claim inappropriate.[32]

---

[30] Glen posited how the grate may have broken, noting that "[a]ny time something heavy," such as a truck, "rolls over a solid object, it gets a bend." (ECF No. 76-2, at 7.) "[A]nd it was over time that those bends started to snap off." (ECF No. 76-2, at 7.) Love's has certainly called into question the veracity of Glen's testimony by, for example, introducing into the record an invoice that notes that contractors repaired certain portions of the grate in 2018.

[31] The record also suggests that Love's may have had constructive knowledge of the hole as well. But because the evidence of actual knowledge readily creates a material dispute, the Court need not address constructive knowledge at this juncture.

[32] As noted above, it is unclear which portion of the grate was repaired. (ECF No. 59-9, at 1.)

2. **Love's Is Not Entitled to Summary Judgment Pursuant to Contributory Negligence**

   a. **Legal Standard:  Contributory Negligence**

In Virginia, a plaintiff's contributory negligence is a complete bar to liability. *Smith v. Va. Elec. & Power Co.*, 129 S.E.2d 655, 659 (Va. 1963). Although a premises owner owes a duty of ordinary care to invitees, the owner is "not an 'insurer of the invitee's safety.'" *AlBritton v. Commonwealth*, 853 S.E.2d 512, 520 (Va. 2021) (quoting *Tate v. Rice*, 315 S.E.2d 385 (Va. 1984)).  Thus, "the owner has no duty to warn its invitee of an unsafe condition which is open and obvious to a reasonable person exercising ordinary care for [their] own safety." *Id.* (quoting *Fobbs v. Webb Bldg. Ltd. P'ship*, 349 S.E.2d 355 (Va. 1986)).  Generally, "[w]hether a danger is open and obvious is . . . a jury question." *O'Brien v. Everfast, Inc.*, 491 S.E.2d 712, 715 (Va. 1997).  "When the defect is of such a character that reasonable and prudent persons may reasonably differ as to whether an accident could or should have been reasonably anticipated from its existence or not, then the case is generally one for the jury." *Fultz*, 677 S.E.2d at 274–75 (cleaned up) (quoting *City of Roanoke v. Sutherland*, 167 S.E. 243, 246 (Va. 1933)).

Moreover, while it is true that a "person who trips and falls over an open and obvious condition or defect is guilty of contributory negligence as a matter of law," *Scott v. City of Lynchburg*, 399 S.E.2d 809, 810 (Va. 1991), Virginia courts will *not* find a plaintiff contributorily negligent as a matter of law if she "show[s] conditions outside herself which prevented her [from] seeing the dangerous condition or which would excuse her failure to observe it." *Fultz v. Delhaize Am., Inc.*, 677 S.E.2d 272, 275 (Va. 2009).  The excuse for inattention must be "reasonable, i.e. . . . the distraction was unexpected and substantial." *Southern Floors & Accoustics, Inc. v. Max-Yeboah*, 594 S.E.2d 908, 910 (Va. 2004).

38

**b.     Genuine Issues of Material Fact Exist as to Whether the Hole Was Open and Obvious and Whether Wallace's Excuse for Stepping into the Hole was Reasonable Under the Circumstances**

First, Love's has not shown that as a matter of law the hole was open and obvious. *Bassett Furniture Industries, Inc. v. McReynolds* is instructive. 224 S.E.2d 323 (Va. 1976). There, a defendant claimed that the plaintiff was contributorily negligent by falling through a hole roughly four feet wide and twelve feet long. *Id.* at 328. The Virginia Supreme Court, however, refused to grant the defendant summary judgment based on contributory negligence because the plaintiff presented evidence that plaintiff and several other men failed to notice the hole.[33] *Id.* at 330. Such evidence was sufficient to allow a jury to find that a reasonable person would not find the hole open and obvious. *Id.*; *cf. Rocky Mount Shopping Ctr. Assocs. v. Steagall*, 369 S.E.2d 193 (Va. 1988) (finding plaintiff contributorily negligent where she testified that she "could have [seen] [the hazardous condition] if [she] had been looking for it" (first and third alterations in original)).

So too here. In Wallace's declaration, she stated that the hole "was not obvious or clearly visible." (ECF No. 76-6, at 3.) Despite having stopped "at this specific truck stop for many years before March 29," Wallace "had never observed [this] gap in the trench drain." (ECF No. 76-6 ¶ 24–25.) Moreover, Love's employee Doug Perkins walked past the hole a "dozen times"—even placing a large orange cone within five to six feet of it—yet failed to observe it. (ECF No. 59-5, at 6; ECF No. 87-2, at 10.) And as Wallace's photograph depicts, the hole and the grate are dark in color, which could make distinguishing the two difficult. (ECF No. 77-6.) Certainly, Wallace's expert Ronald Santicola did opine that the hole was "a pretty big opening,"

---

[33] Although the conditions (*i.e.*, an unlit room) in *Bassett* may have been darker than those present here, the Court finds that other factors on this record present a factual dispute as to whether the grate was open and obvious.

39

and that "to [him] it would be evident that there is something there that's a problem." (ECF No. 59-8, at 4.) The current record—including photographs of the hole—does not establish that the hazardous condition was so evident that no reasonable person could think that Wallace was not negligent.

Even if Love's had successfully shown that the hole was open and obvious as a matter of law, Wallace has still raised a triable issue of fact as to whether the danger of trucks on the premises was a reasonable (*i.e.*, unexpected and substantial) excuse for failing to notice them. Wallace testified that as she was walking into the Love's store, she kept her "eyes on the Love's truck" in front of her. (ECF No. 76-6, at 2; *see also, e.g.*, ECF No. 59-3, at 7–9.) The fuel lanes were, according to her, "a bad place not to pay attention." (ECF No. 62-5, at 4.) Likewise, Perkins testified that he was trained to "walk out in front" of tractor-trailers and to "make eye contact with the driver[s]" so that tractor-trailers would not injure him. (ECF No. 76-8, at 21.) He also testified that when Love's employees are "outside walking around. . . [they are] looking around making sure there's no trucks coming anywhere near" them. (ECF No. 87-2, at 9.)

In *Fultz*, a grocery store sought summary judgment against a customer based on contributory negligence because the customer failed to notice the protruding metal bars on which she tripped. 677 S.E.2d at 87–88. The court assumed for the sake of argument that the bars were open and obvious. *Id.* at 89. The court nevertheless declined to grant summary judgment to the store because the customer provided evidence that she was distracted by (1) operating an ATM at the time, and (2) her three-year-old grandson's sudden movement away from her. *Id.* at 87, 91. Such evidence, the Court held, was sufficient to establish a genuine issue of material fact as to whether the customer's excuse for tripping over an open and obvious condition was valid. *Id.* at

91. The same is true here because Wallace claims to have been distracted by looking out for trucks on the premises, and a jury could find that such an excuse was reasonable.[34]

---

[34] Love's also fleetingly argues that Wallace was contributorily negligent because she "parked improperly" behind another truck in the fueling lane. (ECF No. 59, at 6.) But there exists a genuine issue of material fact about whether this was negligent. For example, Perkins testified that "every driver who comes in and inspects their vehicle while they're fueling up would walk over the trench drain area." (ECF No. 62-3, at 11.) He noted that "[i]t's not the normal flow of traffic walking area," but that people still frequently traverse the area. (*Id.*) Moreover, Wallace's expert Santicola testified that the fuel island—and the area near the grate— see "general foot traffic by the public." (ECF No. 59-8, at 5.) Stanton also stated that it was "common" for drivers to park behind other trucks in the diesel fuel lanes. (ECF No. 76-12, at 3.)

## IV.  Conclusion

For the foregoing reasons, the Court will deny Love's Motion for Summary Judgment,

(ECF No. 58), and will grant Wallace's Partial Motion for Summary Judgment, (ECF No. 61).

Date: 7-20-2022                                /s/
Richmond, Virginia                          M. Hannah Lauck
                                            United States District Judge

42